## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DR. ROBERT LEWIS, | ) |
| | ) |
| Plaintiff, | ) CIVIL ACTION NO. 3:2007-13 |
| | ) |
| v. | ) |
| | ) JUDGE GIBSON |
| UPMC BEDFORD AND UPMC, | ) |
| | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION and ORDER OF COURT

**GIBSON, J.**

Presently before the Court is the motion for summary judgment (Docket No. 32) filed by defendants UPMC Bedford and UPMC (together "UPMC" or "defendants") endeavoring to foreclose all claims brought against UPMC in plaintiff Dr. Robert Lewis' ("Dr. Lewis" or "plaintiff") first amended complaint. (Docket No. 23). Plaintiff's amended complaint asserts claims against defendants for violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§12101 *et seq.,* Rehabilitation Act, 29 U.S.C. § 794, Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§951 *et seq.,* and the Wage Payment and Collection Law ("WPCL"), 43 P.S. § 260.1, as well as two counts claiming breach of contract, and requests relief in the form of backpay, compensatory damages, consequential damages, punitive damages, liquidated damages and any other lost emoluments of employment. Defendants answered plaintiff's first amended complaint on January 14, 2008, then moved for summary judgment on May 8, 2008, pursuant to Federal Rule of Civil Procedure 56(c).

Plaintiff responded to defendants' motion on July 14, 2008. Both parties have populated the record with the requisite supporting documentation, and defendants' motion is now poised for disposition. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction of the stat law claims pursuant to 28 U.S.C. § 1367(a). Venue is proper under 28 U.S.C. § 1391(b).

UPMC Bedford Memorial Hospital ("UPMC Bedford") receives federal financial assistance indirectly through Medicare and Medicaid. Plaintiff's Statement of Facts[1] ("PSOF") ¶2. Dr. Marc Finder ("Dr. Finder") was the Chair of the Emergency Department ("ED") *vis a vis* a contract between UPMC Bedford and West Straub Professional Services[2], the entity through which Dr. Finder's services were rendered, during the time period relevant to this lawsuit. PSOF ¶¶5-6; Defendant's Statement of Facts ("DSOF") ¶¶11-13, 16. Dr. Lewis, a trained physician by profession, provided services to the ED of UPMC Bedford as a locum tenens[3] physician beginning on or about July 12, 2001, after being recruited by Dr. Finder. PSOF ¶7; DSOF ¶¶ 1, 3. Defendants maintain that Dr. Lewis was hired by Dr. Finder, through West Straub Professional Services, as an independent contractor to UPMC Bedford,

---

[1] While the court recognizes that defendant has not filed responses to plaintiff's statement of facts and as such these facts cannot be considered "undisputed facts of record," the court gives these facts consideration only to the extent that either they are congruous with defendants' statement of facts or that they are harmonious with the principle of "drawing all reasonable inferences in the light most favorable to the non-moving party." *El v. Southeastern Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).

[2] The contract was executed in December 1997 between West Straub Professional Services and Memorial Hospital of Bedford County, the predecessor to UPMC Bedford. Defendants' Statement of Facts ("DSOF") ¶11.

[3] Locum tenens physicians are appointed at the recommendation of the chair of the department in which they will be providing service to fill an existing vacancy. Their credentials must meet the requirements established by the Medical Staff Bylaws and the appointment is approved by the president of the medical staff and the president and CEO of UPMC Bedford. The appointments are initially for 30 days, but can be extended for an additional 30 days. There are no provisions allowing for a locum tenens appointment to extend beyond 60 days. DSOF ¶ ¶5-6, Plaintiff's Statement of Facts ("PSOF") ¶16.

and that he maintained his locum tenens status the entire time in which he provided services to the ED, and that at no time was Dr. Lewis an employee of UPMC. *See generally*, DSOF ¶¶2-4, 7-8, 11-16. Plaintiff contends that he was hired by UPMC and that after his initial locum tenens term he was hired full time as an independent contractor and achieved full medical staff privileges, including gaining rights under the Medical Staff Bylaws ("the bylaws"). *See generally*, PSOF ¶¶7-11.

Because of his locum tenens status between August 2001 and August 2002, Dr. Lewis had to pay for his malpractice insurance, and was not required or permitted to attend department meetings. PSOF ¶9. In August 2002, Dr. Lewis' request for application for membership on the Medical Staff was approved by the Board of Directors of UPMC Bedford. DSOF ¶29. Dr. Lewis was then required to complete and return the application with other necessary supporting documentation within 60 days, or his application would expire and he would not be permitted to reapply for one year. DSOF ¶29. Once the information is submitted, it is verified by the Credentials Committee which reviews the application and interviews the applicant, then generates a report for the Board, which decides whether the appointment of the applicant to the Medical Staff will be made. DSOF ¶¶31-33. Initially an applicant is appointed to the Medical Staff for one year, with subsequent reappointments usually consisting of a period of two years. DSOF ¶¶35-36. UPMC Bedford contends that Dr. Lewis was never approved for membership to the Medical Staff because the process was never completed. DSOF ¶¶38-40. Dr. Lewis, however, believed that he completed the application process, and that he was a member of the Medical Staff. PSOF ¶14. Dr. Lewis' belief was founded, in part, on the fact that after August 2002, he was required to attend department meetings and was reimbursed for malpractice insurance. PSOF ¶11. Furthermore, the bylaws do not allow a locum tenens appointment to extend beyond 60 days.

3

PSOF ¶16.

In June 2003, Dr. Lewis informed Dr. Finder that he suspected that he had Attention Deficit Disorder ("ADD"), and that he was considering being formally evaluated. PSOF ¶19; DSOF ¶¶63, 67. The manifestation of Dr. Lewis' ADD presented as distraction, disorganization, and restlessness. DSOF ¶61. Dr. Lewis self-accommodated for his ADD by making lists and doing one thing at a time. DSOF ¶62. Dr. Lewis requested that he be allowed to see one patient at a time and then "batch"[4] his medical charts after he finished seeing his patients as an accommodation for his ADD. PSOF ¶22; DSOF ¶65. Dr. Finder denied this request, although he purportedly allowed other ED physicians to "batch" charts. PSOF ¶¶22-24; DSOF ¶66.

At some point in early 2004, Dr. Finder instituted a "shadowing" program at UPMC Bedford ED, where one physician would be followed by a physician observer so that the two could have a colloquy about the administration of care in the department. *See generally,* DSOF ¶¶48-50. According to Dr. Finder, the intention of the program was that all the ED physicians would be shadowed. DSOF ¶51. According to Dr. Lewis, however, Dr. Fleming, another ED physician, informed him that the shadowing program was directed at him because Drs. Fleming and Finder believed Dr. Lewis had an impairment and was in need of psychiatric evaluation. PSOF ¶35. Dr. Lewis was the first ED physician to be shadowed, the physician observer being Dr. Finder and/or Dr. Fleming, during a period in February and/or March 2004. *See generally,* DSOF ¶¶53, 55; PSOF ¶¶35-36. Shortly thereafter, the shadowing program was "tabled until the Fall" in June, 2004, and then "tabled" completely in

---

[4]The parties refer to "batching" charts as the practice of dictating medical charts all at one time after having examined multiple patients. PSOF ¶22; DSOF ¶66.

4

December, 2004. PSOF ¶38.

Dr. Lewis was formally notified that he was being placed on probation for no less than one month by letter dated March 18, 2004, for the reasons discussed in a March 5, 2004, meeting between Drs. Finder, Fleming and Lewis. DSOF ¶57; PSOF ¶42. Dr. Lewis avers that during that meeting, Drs. Finder and Fleming informed him that they thought he was impaired, that they thought he was distractible due to his ADD, and that he was required to have a psychological evaluation. PSOF ¶¶42, 49. Additionally, Dr. Lewis was to no longer do any law school work during his shifts in the ED, no longer permitted to use the internet or pursue personal financial issues during periods of down time during his shifts, that he must remain focused on his ED duties during his shifts, and that he was to provide Dr. Finder with the name of a therapist by whom Dr. Lewis would be evaluated to "determine if [Dr. Lewis has] an underlying problem which [impaired his] ability to concentrate and perform [his] duties as required," and that Roger Winn ("Mr. Winn"), president of UPMC Bedford, would need to be satisfied with the medical documentation from the evaluation, and that the choice of therapist would have to be made in conjunction with Dr. Fleming. *See,* DSOF ¶58; PSOF ¶¶43, 46.

After being put on probation on March 18, 2004, Dr. Lewis contacted Dr. Rubin Echemendia, a neuropsychologist, to perform an evaluation, in compliance with the terms of his probation. DSOF ¶¶68-69; PSOF ¶¶53-54. Dr. Lewis met with Dr. Echemendia on March 25, 2004, April 14, 2004, May 6, 2004, and May 19, 2004, and underwent a battery of tests and evaluations in order to determine if he did, in fact, have ADD. DSOF ¶¶69-70; PSOF ¶54. At his first meeting with Dr. Echemendia, Dr. Lewis provided a copy of the March 18, 2004, probation letter. DSOF ¶72. Dr. Echemendia's evaluation of Dr. Lewis included gathering a lot of personal information from Dr. Lewis unrelated to

5

his ability to perform as an ED physician. PSOF ¶¶55-56. As a result of the evaluation, Dr. Echemendia concluded that Dr. Lewis had Attention Deficit Hyperactivity Disorder ("ADHD"), but that he was a very bright individual with a lot of variability in his cognitive functioning. PSOF ¶58.

Dr. Echemendia sent Dr. Finder a letter dated April 14, 2004, advising him that Dr. Lewis had retained Dr. Echemendia's services for the purpose of a neuropsychological evaluation. DSOF ¶73. Dr. Finder wrote in response that he needed more information, including the time frame for the neuropsychological evaluation process, when potential therapies and interventions would begin, frequency of visits, types of tests, and as much information as possible because Dr. Lewis was at risk of termination if the information supplied was not satisfactory to Dr. Finder's supervisor, Mr. Winn. DSOF ¶74; PSOF ¶¶60-61. Dr. Echemendia responded to Dr. Finder's letter by way of letter indicating that the neuropsychological evaluation had concluded, and that he could not release as much information as possible because of doctor-patient confidentiality requirements, but invited Dr. Finder to forward any specific questions he had to him. DSOF ¶75; PSOF ¶¶63-64. Dr. Finder never responded to this letter, nor did he ever forward any specific questions to Dr. Echemendia, but he did follow up with Dr. Lewis, informing him that he needed a report, according to Dr. Finder, or the entire file, according to Dr. Lewis, from Dr. Echemendia. DSOF ¶78; PSOF ¶¶65, 67. Dr. Echemendia's file on Dr. Lewis contains confidential information unrelated to his ability to perform as an ED physician PSOF ¶71.

On December 5, 2004, Dr. Finder suspended Dr. Lewis from the ED schedule effective December 11, 2004. DSOF ¶85; PSOF ¶87. The reasons given for the suspension in a letter formalizing the action dated December 7, 2004, were Dr. Lewis' failure to provide a letter from his psychologist

6

regarding his evaluation, failing to park in the doctors' parking lot, having unsigned medical records for over 30 days, and missing a department meeting. DSOF ¶92; PSOF ¶¶93-96. Dr. Echemendia sent or faxed a letter to Dr. Finder dated December 6, 2004, indicating that the data obtained from Dr. Lewis' neuropsychological evaluation does not reflect any cognitive deficits that would affect Dr. Lewis' ability to practice emergency room medicine. DSOF ¶¶95-96; PSOF ¶97.

On January 14, 2005, Dr. Lewis had a meeting with Dr. Finder and Michelle Speck, UPMC Bedford's Vice President of Human Resources, wherein the capacity in which his services were rendered to the ED was terminated. DSOF ¶¶100, 103-105; PSOF ¶110. During the meeting, Dr. Finder informed Dr. Lewis that he was being terminated for failure to provide Dr. Echemendia's medical record, although Dr. Finder told Michelle Speck it was a fitness for duty issue. PSOF ¶114. Dr. Lewis advised Dr. Finder that Dr. Echemendia had requested specific questions relating to Dr. Lewis' condition, but Dr. Finder replied that he believed he had given Dr. Echemendia a sufficient explanation of the information he wanted. DSOF ¶¶110-11.

Dr. Lewis and other full-time emergency room physicians were reimbursed for their malpractice insurance by UPMC. PSOF ¶74. Mr. Winn issued a letter dated May 14, 2004, to the emergency department physicians advising of the creation of an account for the payment of tail coverage if a physician left the hospital. DSOF ¶126; PSOF ¶¶77-78. The letter states that, "By signing and returning a copy of this letter to [Mr. Winn], [ED physicians] will signify that [they] accept this [tail coverage] arrangement." PSOF ¶80. According to Mr. Winn, the letter was not intended to apply to Dr. Lewis. DSOF ¶128. The letter Dr. Lewis received had his name handwritten in the top right hand corner. PSOF ¶84. Dr. Lewis signed and returned the letter to Mr. Winn, and received nothing back indicating

7

that the letter did not apply to him. PSOF ¶81. After Dr. Lewis' services in the ED surceased, UPMC did not reimburse him for his December 2004 malpractice premium, nor for the purchase of tail coverage, despite Dr. Lewis' requests. DSOF ¶129; PSOF ¶¶85-86.

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, the discovery and disclosure materials on file and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 249. The court is to draw all reasonable inferences in favor of the nonmoving party. *El v. Southeastern Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir.2007)("In considering the evidence, the court should draw all reasonable inferences against the moving party."). The United States Court of Appeals for the Third Circuit recently stated:

> [I]f there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted. Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will.

*Id.*

Count I of plaintiff's complaint alleges discrimination under Title III of the ADA, specifically, that defendants denied him the opportunity to participate in the medical staff privileges offered by

8

UPMC Bedford because of his disability, namely ADHD. Defendants argue that summary adjudication is appropriate for this claim because plaintiff has failed to demonstrate a causal connection between his disability and the adverse acts allegedly committed by defendants and that plaintiff was never a member of the medical staff and, ergo, incapable of being suspended therefrom. Plaintiff rejoins by averring that whether he was discriminated against and whether he had medical staff privileges are hotly contested factual issues that should be decided by a jury.

Title III of the ADA states:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a).

Plaintiff maintains that he was denied the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of a place of public accommodation when he was denied staff privileges at the hospital.

As plaintiff points out, in *Menkowitz v. Pottstown Memorial Medical Center*, 154 F.3d 113 (3d Cir. 1998), the United States Court of Appeals for the Third Circuit stated:

> We therefore hold that a medical doctor with staff privileges - one who is not an employee for purposes of Title I - may assert a cause of action under Title III of the ADA as an "individual" who is denied the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation."

*Id.* at 122.

Defendant makes clear that plaintiff was not an employee of UPMC or UPMC Bedford. Defendants'

9

primary contention against this claim is that plaintiff was not denied membership to the medical staff, or suspended from the medical staff, because of his disability. Defendants' argument focuses on the fact that plaintiff did not complete the process for becoming a member of the medical staff, never applied for reappointment to the medical staff, and that plaintiff's disclosure of his disability occurred after his medical staff application procedure had concluded. Defendants' focus on plaintiff's Title III claim, however, is much too constringent. Plaintiff's complaint, and indeed the holding in *Menkowitz*, do not refer to membership on the medical staff. Rather, they refer to physicians with staff privileges. It is undisputed that plaintiff was required to attend department meetings and was reimbursed for his malpractice insurance, to say nothing of his ability to practice medicine and treat emergency room patients at the hospital, as were members of defendants' medical "staff." Thus, whatever defendants categorize his position in the ED to have been, it cannot be denied that, whether or not he was actually a member of the staff, he enjoyed the same privileges as the staff when providing his services in the ED at the hospital. The Court therefore concludes that plaintiff has established his standing to bring a cause of action under Title III of the ADA.

That does not end the inquiry, however, it merely resolves the standing issue. The Court now is tasked with evaluating if plaintiff has made his *prima facie* case to determine whether the claim can withstand summary judgment. In order to advance a successful claim under Title III of the ADA, plaintiff must show that: (1) he was discriminated against on the basis of disability; (2) in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation; (3) by any person who owns, leases (or leases to), or operates a place of public accommodation. *See e.g., Douris v. Dougherty*, 192 F.Supp.2d 358, 368 (E.D.Pa. 2002);

10

*Bowers v. National Collegiate Athletic Ass'n*, 118 F.Supp.2d 494, 514 (D.N.J. 2000); *Sharrow v. Bailey*, 910 F.Supp. 187 (M.D.Pa. 1995).

With respect to the first factor, plaintiff contends that he was regarded as disabled by, among others, Dr. Finder. In support of this contention, plaintiff offers that Dr. Finder treated him differently after learning about his ADHD, Dr. Finder initiated the shadowing program because of plaintiff's condition, plaintiff was required to undergo a neuropsychological evaluation, the results of which had to be satisfactory to Dr. Finder's supervisor, Mr. Winn, being restricted in a manner that was not applied to other ED physicians, and being criticized in front of patients and staff for symptoms of his ADHD such as distraction. To prevail under the "regarded as" prong of the ADA's definition of disability, plaintiff must show that defendant "mistakenly believed that [plaintiff] ha[s] a physical impairment that substantially limits one or more major life activities" or " mistakenly believed that an actual non-limiting impairment substantially limits one or more major life activities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999). Plaintiff must show more than that defendant viewed him as impaired in some way, but rather that defendant viewed him as disabled "within the meaning of the statute." *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 381 (3d Cir. 2002).

Plaintiff has adduced substantial evidence of record to persuade the Court that genuine issues of material fact exist as to whether Dr. Finder regarded plaintiff as having a substantially limiting disability. This is most evidently so by the fact that one of the stated reasons for plaintiff's suspension and eventual termination was his failure to provide medical information regarding his disability, which is discussed in greater detail below. Further, under the first element of the *prima facie* case, a plaintiff need only show that he was discriminated against because of his disability, and there are genuine issues

11

of material fact as to whether his disability was a factor in the suspension and termination of his privileges in the ED.

Any arguments by defendants that they are not liable for discriminatory conduct on the part of Dr. Finder are unavailing. Defendants are responsible for the conditions in their place of public accommodation. The following anecdote from the United States Court of Appeals is illustrative:

> Because liability is direct and not derivative, it makes no difference whether the person whose acts are complained of is an employee, an independent contractor, or for that matter a customer. Ability to "control" the actor plays no role. Employees are not puppets on strings; employers have an arsenal of incentives and sanctions (including discharge) that can be applied to affect conduct. It is the use (or failure to use) these options that makes an employer responsible - and in this respect independent contractors are no different from employees. Indeed, it makes no difference whether the actor is human. Suppose a patient kept a macaw in his room, that the bird bit and scratched women but not men, and that the Hospital did nothing. The Hospital would be responsible for the decision to expose women to the working conditions affected by the macaw, even though the bird (a) was not an employee, and (b) could not be controlled by reasoning or sanctions. It would be the Hospital's responsibility to protect its female employees by excluding the offending bird from its premises. This is, by the way, the norm of direct liability in private law as well: a person "can be subject to liability for harm resulting from his conduct if he is negligent or reckless in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control." RESTATEMENT (SECOND) OF AGENCY § 213(d).

*Dunn v. Washington County Hospital*, 429 F.3d 689, 691 (7th Cir. 2005).

The second element of plaintiff's *prima facie* case requires a showing that plaintiff was denied the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation. The Court finds that the holding in *Menkowitz* controls this inquiry:

12

> Because of the appellant's suspension from the active medical staff, he can
> no longer enjoy the hospital's physical facilities in providing the necessary
> medical and consulting services to his patients. . . . [W]e cannot imagine a
> greater nexus between the privileges, advantages, or services denied and
> physical access to hospital facilities simply because of the nature of medical
> staff privileges - privileges that lie at the very core of a hospital's facilities.

*Menkowitz*, 154 F.3d at 122.[5] The Court thus finds that plaintiff has satisfied the second element of his

prima facie case.

The third element of a *prima facie* case under Title III of the ADA, that defendants own, lease

(or lease to), or operate a place of public accommodation is not contested by the parties. The Court

therefore concludes that plaintiff has standing to pursue a claim under Title III of the ADA and has

satisfied the elements of a *prima facie* case. Because genuine issues of material fact are present as to

this claim, defendants' motion for summary judgment will be denied as to Count I of plaintiff's

complaint.

Count II of plaintiff's complaint claims defendants violated the Rehabilitation Act by seeking

medical information from Dr. Lewis and his treating psychiatrist regarding the nature or extent of his

disability. Defendant contends that the inquiry was job-related and consistent with business necessity.

Plaintiff retorts that the scope of the inquiry was too broad to be consistent with business necessity.

The ADA addresses the conditions under which an employer may require an employee to submit

to a medical examination:

> A covered entity shall not require a medical examination and shall not make
> inquiries of an employee as to whether such employee is an individual with

---

[5]While the plaintiff in *Menkowitz* was a member of the defendant hospital's medical staff, unlike the plaintiff here, the court in *Menkowitz* focused on the plaintiff's ability to render services to patients in defendant's facility, and not on his status as a member of the medical staff, to inform their decision. As such, the case before the Court is not distinguishable.

13

> a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

42 U.S.C. § 12112(d)(4)(A).

The federal regulations further clarify, "[a] covered entity may require a medical examination (and/or inquiry) of an employee that is job-related and consistent with business necessity." 29 C.F.R. § 1630.14(c). The United States Court of Appeals for the Third Circuit has held that medical examinations consistent with business necessity are limited to an evaluation of the employee's fitness for a specific type of work, and a "request for such an appropriately-tailored examination only establishes that the employer harbors doubts (not certainties) with respect to an employee's ability to perform a particular job. Doubts alone do not demonstrate that the employee was held in any particular regard . . ." *Tice v. Centre Area Transp. Authority*, 247 F.3d 506, 515 (3d Cir. 2001). As plaintiff concedes, Dr. Finder's request that he submit to a neuropsychological exam was to ensure he was capable of doing his job and therefore does not constitute evidence of discrimination against plaintiff in and of itself. While the Court accedes, and the parties do not seem to dispute, that the medical evaluation itself served a legitimate business purpose, Dr. Finder's conduct with respect to his demands for information related to the evaluation are far more suspect. Specifically, the breadth of his request for information went beyond what could reasonably be considered necessary for business purposes and the explanation that he refused to proffer specific questions to Dr. Echemendia because he did not know what to ask does not establish such necessity. The Court views this explanation to be unavailing because, as a medical professional, Dr. Finder should be well aware of the confidentiality standards. Furthermore, Dr. Finder indicates plaintiff's failure to provide sufficient documentation from his

14

neuropsychological evaluation as a reason for his suspension and termination. As the United States

Court of Appeals for the Third Circuit noted in *Taylor v. Phoenixville School District*, 184 F.3d 296

(3d Cir. 1999),

> Once the employer knows of the disability and the employee's desire for
> accommodations, it makes sense to place the burden on the employer to
> request additional information that the employer believes it needs. Disabled
> employees, especially those with psychiatric disabilities, may have good
> reasons for not wanting to reveal unnecessarily every detail of their medical
> records because much of the information may be irrelevant to identifying
> and justifying accommodations, could be embarrassing, and might actually
> exacerbate workplace prejudice. An employer does not need to know the
> intimate details of a bipolar employee's marital life, for example, in order
> to identify or justify an accommodation such as a temporary transfer to a less
> demanding position.

*Id.* at 315.

This discussion in *Taylor*, as is obvious from the passage, arose in the context of providing

reasonable accommodation to a disabled employee under the ADA, but the sound logic advanced

therein applies with equal force to the issue confronting the Court here. *See, e.g., New Directions*

*Treatment Services v. City of Reading*, 490 F.3d 293, 302 (3d Cir. 2007) (noting that Congress has

directed the judicial standards for analyzing the ADA and the Rehabilitation Act be harmonized) (citing

*Newman v. GHS Osteopathic, Inc.*, 60 F.3d 153, 157-58 (3d Cir. 1995)). The Court therefore concludes

that plaintiff has advanced a cognizable claim under the Rehabilitation Act in Count II of his complaint,

and defendants' motion for summary judgment will be denied as to that claim.

Plaintiff next claims, in Count III, that based on his loss of staff privileges at the hospital and

the inquiry into his medical condition defendants violated Section 504 of the Rehabilitation Act.

Defendants' arguments for summary judgment on this count are that plaintiff and defendants did not

15

have an employment relationship, plaintiff was not regarded as disabled, and the adverse acts plaintiff complains of were not motivated solely by his disability. Plaintiff responds by asserting that an employment relationship is not an element of his claim, material issues of fact exist as to whether he was regarded as disabled, and there is substantial evidence that he would not have been removed from the schedule, suspended or terminated "but for" his disability.

The pertinent language of § 504 of the Rehabilitation Act states:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 194(a).

A plaintiff will establish a violation of this section by proving:

> (1) that he is a "handicapped individual" under the Act, (2) that he is "otherwise qualified" for the position sought, (3) that he was excluded from the position sought "solely by reason of his handicap," and (4) that the program or activity in question receives federal financial assistance.

*Menkowitz*, 154 F.3d at 123 (citations omitted).

Defendants' first challenge to plaintiff's § 504 claim is that an employment relationship did not exist between plaintiff and defendants. However, the Court is inclined to agree with plaintiff that an employment relationship need not be established in order to maintain a claim under this section, and indeed, as plaintiff points out, the Third Circuit, in *Menkowitz*, allowed a § 504 claim to proceed against a hospital by a physician that was an "independent contractor," not unlike the issue presently before the Court. Although the Court did not address the employment issue directly, its holding permitting the

16

maintenance of the claim in those circumstances may be considered an affirmance *sub silencio* of the argument plaintiff advances. Defendants cite no precedent in support of their argument that an employment relationship is a necessary element of a § 504 claim, opting rather to launch directly into their argument for determining an individual's employer when more than one entity exerts control over the same employees, ultimately concluding that the appropriate approach is the joint employer test. As plaintiff points out, the plain language of the statute does not indicate that an employment relationship is a requirement for making a claim. As defendants reveal in their footnote, "In most instances, doctors with staff privileges are not employees of the hospital, but instead, are independent contractors . . ." Def.'s Br. at 7, n.5 (citation omitted). Were the Court to adopt the position proffered by defendants, the remedies available for those subject to disability discrimination would be foreclosed to a large class of individuals. It is doubtful that Congress had this intent.

The Court finds that plaintiff has established the first element of his § 504 claim, that he is a handicapped individual under the Act, for the same reasons as set forth above discussing Count I. Defendants do not contest the second element of plaintiff's claim, that plaintiff was otherwise qualified for the position, and the Court therefore determines that the second element has been satisfied. Neither do the parties contest the fourth element of plaintiff's claim.

Thus, the Court must determine whether plaintiff was excluded from the position sought solely by reason of his handicap. Defendants aver that plaintiff was not discriminatorily singled-out to be shadowed. Defendants allege that other physicians were shadowed around the same time as plaintiff and therefore plaintiff was treated no differently than others because of his disability. Plaintiff has offered evidence that the shadowing program was instituted because of concerns about his performance

17

in the ED based on his disability. Because the Court must take all facts in the light most favorable to the non-moving party at the summary judgment stage, the Court concludes that material issues of fact are in dispute on this issue.

Defendants further state that plaintiff's suspension and eventual termination from the ED schedule were not solely the result of his disability. The reasons for his suspension were his failure to provide Dr. Finder with a letter from his psychologist, failure to park in the doctor's parking lot, having unsigned medical records after 30 days, and missing a department meeting. Plaintiff argues that the subject of his disability permeated the decisions regarding his providing services to the ED, and that the other reasons proffered for his suspension and termination were pretextual. The Court observes that the parking issue was, which the parties concede, the result of a misunderstanding. Plaintiff avers that he missed the department meeting because it was rescheduled while he was on vacation and was unaware of its occurrence. Plaintiff also contends that other ED physicians occasionally did not sign medical records and were not subject to the same treatment as he. Additionally, his failure to sign medical records could be the result of his disability. For these reasons, the Court concludes that material questions of fact exist as to whether plaintiff was suspended and terminated from the ED schedule solely because of his disability. As the Court in *Menkowitz* observed:

> The hospital was fully aware of the [plaintiff]'s disability and, nearly a year later, suspended staff privileges.... In the interim, the hospital is alleged to have engaged in a pattern of harassment and intimidation, unfairly and disparately accusing [plaintiff] of hospital policy infractions. These facts give us pause and would no doubt create, at the very least, an inference which must be drawn in the [plaintiff]'s favor - specifically, that the hospital suspended staff privileges solely based on the [plaintiff]'s known disability.

*Menkowitz,* 154 F.3d at 125.

18

The circumstances in the case presently before the Court are not too dissimilar. The Court therefore concludes that plaintiff has established a cognizable claim under § 504 of the Rehabilitation Act, and defendants' motion for summary judgment will be denied as to Count III of plaintiff's complaint.

In Count IV, plaintiff asserts a claim for breach of contract for defendants' failure to adhere to their bylaws regarding plaintiff's suspension and termination. Defendants maintain that summary judgment is appropriate on this count because no contractual relationship existed between plaintiff and defendants, because the bylaws constituted an enforceable contract between the hospital and members of the medical staff, and plaintiff never became a member of the medical staff. Plaintiff ripostes by averring that whether he was a member of the medical staff is fraught with factual discrepancies and therefore is a matter for a jury to decide.

"Under Pennsylvania law, contract formation requires: (1) a mutual manifestation of an intention to be bound, (2) terms sufficiently definite to be enforced, and (3) consideration." *Kirleis v. Dickie, McCamey & Chilcote, P.C.,* ___ F.3d ___ (3d Cir. 2009) (citing *Blair v. Scott Specialty Gases,* 283 F.3d 595, 603 (3d Cir. 2002)). Although this Court has previously held that plaintiff enjoyed medical staff privileges at the hospital, that does not mean that the Court finds that plaintiff was a member of the medical staff. The bylaws dictate a specific procedure for appointment to the medical staff. Plaintiff neglected to follow this procedure. The bylaws are an enforceable contract between the hospital and members of the medical staff. *Miller v. Indiana Hosp.,* 419 A.2d 1347, 1349 (Pa.Cmwlth. 1976). Plaintiff, however, was not a member of the medical staff. Plaintiff cannot ignore his obligations under the bylaws on the one hand and then turn around and hold the hospital accountable

19

for their responsibilities under the bylaws on the other. To state it another way, there is no mutual manifestation of an intention to be bound. Thus, summary judgment will be granted to defendants on Count IV of plaintiff's complaint.

Count V advances another breach of contract claim for defendants failure to provide post-separation insurance coverage. Defendants argue that no contractual obligation exists because the letter upon which plaintiff purports to rely as establishing the contract was not meant to apply to plaintiff and defendants manifested no intent to be bound by any agreement with plaintiff. Plaintiff rejoins by asserting that material facts are in dispute regarding whether the letter was intended for him, and, as such, dismissal of the claim is inappropriate on summary judgment. This claim is distinguishable from the breach of contract claim in Count IV because, despite defendants' self-serving protestations that the letter was not meant to apply to plaintiff, defendants fail to explain why his name was written on a copy of the letter, and why he was not informed that the agreement did not apply to him after he had signed and returned the letter as the letter instructed. At the very least, this raises material issues of fact, and as such the claim is not proper for summary judgment. "It is the manifested intent of the offeror and not his subjective intent which determines the persons having the power to accept the offer." *Cobaugh v. Klick-Lewis, Inc.*, 561 A.2d 1248, 1251 (Pa.Super. 1989) (citing RESTATEMENT (SECOND) OF CONTRACTS § 29).

Plaintiff advances a claim under the PHRA in Count VI of his complaint based upon the above detailed conduct or alternatively that defendants aided and abetted Dr. Finder's discrimination. Defendants contend that they are free from liability under the PHRA because they were not plaintiff's employer, that plaintiff's PHRA claim fails for the same reasons that his ADA and Rehabilitation Act

20

claims fail, and that defendants did not aid and abet Dr. Finder's alleged discrimination. Plaintiff's response is that the PHRA extends protection to independent contractors and that factual issues abound regarding defendants' aiding and abetting Dr. Finder's conduct precluding summary judgment on this claim.

Independent contractors are protected from discrimination under the PHRA. *See Uber v. Slippery Rock University of Pennsylvania*, 887 A.2d 362, 364, n.3 (Pa.Commw. 2005) (citing 43 P.S. § 955(a)). Medical doctors are included in the definition of independent contractors under the PHRA. *See Velocity Express v. Pennsylvania Human Relations Commission*, 853 A.2d 1182, 1186 n.7 (Pa.Cmwlth. 2004). The remainder of defendants' arguments for summary judgment on plaintiff's PHRA claim are the same as those advanced against plaintiff's federal claims detailed above. Because the Court interprets the PHRA as congruous with the ADA, defendants' arguments fail for the same reasons. *See Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002).

Lastly, in Count VII of plaintiff's complaint, a claim is advanced for violation of the WPCL for defendants' failure to reimburse payments for plaintiff's post-separation malpractice insurance and tail coverage. Defendants' reassert the argument that no contractual obligation to pay plaintiff's malpractice insurance or tail coverage existed, and, ergo, no liability can be found under the WPCL. Plaintiff retorts by advancing his same argument that whether an obligation to pay exists is a fact in dispute and therefore not suitable for summary adjudication.

The WPCL provides statutory protection to separated employees as follows:

> Whenever an employer separates an employee from the payroll, or whenever an employee quits or resigns his employment the wages or compensation earned shall become due and payable not later than the next regular pay day

21

of his employer on which such wages would otherwise be due and payable. If requested by the employee such payments shall be made by certified mail.

43 P.S. § 260.5.

The Pennsylvania Wage and Payment and Collection Law Act of July 14, 1961, P.L. 637, *as added by* the Act of July 14, 1977, P.L. 82, defines "wages" as follows:

> "Wages." Includes all earnings of an employee, regardless of whether determined on time, task, piece, commission or other method of calculation. The term "wages" also includes *fringe benefits* or *wage supplements* whether payable by the employer from his funds or from amounts withheld from the employees' pay by employer.

*Department of Transportation v. Pennsylvania Industries for the Blind and Handicapped*, 886 A.2d 706, 714 (Pa.Commw. 2005) (quoting 43 P.S. § 260.2a) (emphasis in original). Contractually agreed upon separation payments and similarly contracted for fringe benefits are recoverable "wages" under the WPCL. *Bowers v. Neti Technologies, Inc.*, 690 F.Supp. 349, 353 (E.D.Pa. 1988).

However, under the plain language of the statute, the protection of the WPCL applies only to employees, and not to independent contractors. The following passage from the Pennsylvania Superior Court's opinion in *Morin v. Brassington*, 871 A.2d 844 (Pa.Super. 2005) is informative:

> In *Frank Burns, Inc. v. Interdigital Comm. Corp.*, 704 A.2d 678 (Pa.Super. 1997), we held the following:
>
>> The WPCL provides no statutory definition of the term "employee." Where a statute does not supply a definition for a term, we must apply the rules of statutory construction. 1 Pa.C.S. § 1502(a)(1). Under these rules, technical words are to be construed according to their "peculiar and appropriate meaning." 1 Pa.C.S. § 1903(a). Two Pennsylvania statutes, the Unemployment Compensation Act and the Worker's Compensation Act, provide technical definitions of the term "employee." [. . .] We find the statutes more persuasive than

22

> agency theory as to the WPCL meaning of "employee" because
> the statutes, like the WPCL, concern compensation for
> employees and, therefore, provide a more similar context.

*Interdigital Comm. Corp.*, 704 A.2d at 680 (footnotes omitted).
One who is an "independent contractor" is not an "employee" within the
meaning of the definition of "employee" in the Worker's Compensation Act.
*See generally Sarver Towing (Wausau Ins. Co.) v. WCAB*, 736 A.2d 61, 62-
63 (Pa.Cmwlth. 1999).

*Morin*, 871 A.2d at 849-50.

Although the Court has determined that questions of material fact exist as to whether or not

plaintiff enjoyed staff privileges at the hospital, the same cannot be said as to whether plaintiff was an

employee of defendants. Moreover, plaintiff has asserted his status as an independent contractor for

maintenance of his Title III claim. He cannot now establish that he was employee for purposes of his

WPCL claim. He cannot have it both ways. Because plaintiff cannot establish that he was an employee

of defendants, his claim under the WPCL fails as a matter of law. Summary judgment will be granted

in favor of defendants on Count VII of plaintiff's complaint.

For all of the foregoing, defendants' motion for summary judgment will be granted as to Counts

IV and VII of plaintiff's complaint, and denied in all other respects.

An appropriate Order follows.

23

**AND NOW**, this 30th day of March, 2009, in accordance with the foregoing Memorandum Opinion, IT IS HEREBY ORDERED THAT the Defendants' Motion for Summary Judgment (Docket No. 32) is GRANTED IN PART as to Counts IV and VII of the Amended Complaint (Document No. 23) and DENIED IN PART as to Counts I, II, III, V, and VI of the Amended Complaint.

**BY THE COURT:**

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**

24